## STATEMENT OF FACTS

1.  This statement of facts ultimately concerns powder cocaine, ammunition, and a rifle that were found during the execution of a search warrant at the home of Keith Cooper located at 141 49th Street SE. This affidavit does not detail every step or fact of the investigation, but rather provides an overview and facts sufficient to establish probable cause that Keith Cooper Possessed Cocaine with the Intent to Distribute, Possessed a Firearm During a Drug Trafficking Offense, and Possessed a Firearm and Ammunition After Being Convicted of an Offense Punishable by More than a Year of Incarceration, within the District of Columbia. Your affiant in this matter is Detective Damion Johnson, of the Metropolitan Police Department's (MPD) Criminal Investigations Division, Homicide Branch.

2.  On Monday, May 16, 2016, at 15:48 hours officers from the Metropolitan Police Department's Sixth District were dispatched to 141 49th Street SE (Keith Cooper's home) in response to multiple 911 calls reporting a shooting. The MPD ShotSpotter gunshot detection system also detected multiple gunshots at that location. Upon arrival at the scene, officers found the decedent, Tracey Louise Cooper, lying on the ground in the front yard of the residence, which is her home. The decedent was unconscious, unresponsive, and suffering from an apparent gunshot wound. Personnel from DC Fire and EMS arrived on scene and found no signs consistent with life. The decedent's remains were left on scene. Members of the MPD Homicide Branch assumed the lead role in investigating this offense.

3.  An investigator with the DC Office of the Chief Medical Examiner (OCME) pronounced the decedent deceased at 18:45 hour and the remains were transported to the OCME for an autopsy. On May 17, 2016, OCME Dr. DiAngelo performed an examination of the decedent. The autopsy revealed that the decedent was shot once. The projectile traveled through her left forearm, entering the torso and passing through the lungs, aorta, and esophagus before coming to rest in the right chest wall. Dr. DiAngelo determined the cause of death to be a gunshot wound to the left lung, aorta, esophagus, and right lung and the manner of death was homicide.

4.  Through a review of evidence and interviews with witnesses, detectives learned that the decedent was shot while she was walking up the steps to her residence. Unknown suspects in a vehicle, which was driving northbound on 49th Street SE, opened fire on the decedent, before fleeing the area. The decedent fell from the stairs to the ground in her front yard where she remained.

5.  When officers first arrived at the scene, they encountered Keith Cooper, PDID 611986, hereinafter the defendant, who initial responding officers learned to be the decedent's son. Initial responding officers described the defendant as being disorderly, which resulted in them placing the defendant in handcuffs to prevent him from interfering with the crime scene. Subsequently, the defendant was told that he was not under arrest and the handcuffs were removed.

6.  In order to preserve the crime scene, MPD officers were positioned at the front and rear of the decedent's residence to ensure no one entered the home, which may contain evidence related to the ongoing murder investigation. The front and rear doors of the residence were both ajar.

7.     The defendant voluntarily came to the Homicide Branch office and spoke with detectives about the murder of his mother. During the interview, the defendant made statements to detectives that he knew that a person known to him as "Twon" killed his mother. Then, the defendant, who was crying and visibly upset, threatened to kill Antwon Miller, his father, and everybody.  The defendant uttered words to the effect of, "I'm going to kill him, he killed my mother. I'm going to kill him, his father, I'm going to kill everybody." The defendant threatened to do so for his mother.  During this interview, the defendant's cellular phone was recovered by Homicide detectives.  The detectives requested consent to search the phone, which the defendant declined.

8.     During his interview with detectives on May 16, 2016, the defendant expressed having concerns for his safety.  In response, services were offered to the defendant.  At a later point in the interview, the defendant refused assistance from MPD to address his safety concerns. When the defendant was asked if he intended to carry out his earlier threats or were the threats uttered out of frustration, the defendant responded that the threats were made out of frustration.

9.     Based on these facts and circumstances, a Superior Court of the District of Columbia arrest warrant was issued on Tuesday May 17, 2016, charging the defendant, Mr. Keith Cooper, with Threats (Felony). The defendant was arrested later the same day. Once in custody, the defendant was interviewed by detectives at the Homicide Branch. He was advised of the *Miranda* warnings, which he waived. During the course of this interview, the defendant granted detectives permission to search his cell phone and seize all data contained therein. During a search of the defendant's phone, detectives found a photograph taken on April 26, 2016, of a black and silver, semi-automatic, Smith and Wesson pistol with serial number FWR2545. The photograph appears to have been taken with the gun placed atop of a mattress with a blue and pink floral pattern. The firearm in the photograph appears to be a real, functioning, firearm. Members of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) conducted a search of the pistol's serial number and determined that the firearm is in fact a 2015 Smith and Wesson model SD40VE .40 caliber pistol.

10.    On the evening of May 17, 2016, after completing several more investigative steps, detectives determined that the residence that the defendant shares with his mother would be secured and that MPD officers would leave the location. Detective McHugh went to the residence to secure the home and document the end of MPD control of the scene. Upon entering the home, Detective McHugh locked the rear door on the main level of the home. Detective McHugh then went downstairs to the basement to check for and secure any below-ground egress and also to check for any animals that may need to be turned over to the Humane Society before the residence was secured. While walking to the rear basement door, Detective McHugh observed what appeared to be a rifle propped against a wall under the stairs in plain view. Upon closer inspection, the rifle was observed to have a wooden stock, metal barrel of approximately twenty inches, and a semi-automatic action. While the rifle appeared to be aged, it did appear to be functional; however, without a closer examination, it is impossible to determine the make, model, and functionality of the rifle. A check of MPD records shows that there are no legally registered firearms at 141 49th Street SE. Additionally, neither Keith Cooper, nor the decedent, Tracey Cooper, have registrations on file with MPD for firearms.

11.     Based on the discovery of the rifle and the photograph of a pistol on the defendant's cell phone, an application was made for a search warrant, granting permission to detectives to search the entire residence for firearms evidence. A Superior Court of the District of Columbia search warrant was issued on Wednesday May 18, 2016, and executed the same day. During a search of the residence, detectives seized the rifle, which was found to be a Model 60 .22 caliber rifle with serial number 23460026. The rifle appeared to be operable. Additionally, detectives located several rounds of .22 caliber rifle ammunition for the rifle that were found within a pouch on the floor next to the rifle.

12.     Also in the same basement where the rifle was, secreted in a shopping bag, detectives located a pistol magazine for a Smith and Wesson .40 caliber pistol, which is similar to the pistol photographed on the defendant's phone. The pistol magazine is capable of holding more than ten rounds of ammunition and is unlawful to possess in the District of Columbia.  The shopping bag was found on the floor, underneath a table, and the table was within approximately five feet of the rifle.

13.     Also in the shopping bag, detectives located a pistol mounted light, a box of 38 special ammunition, and several loose rounds of 9mm, .380 Auto, and 38 Special ammunition; the pistol mounted light and the loose ammunition were contained within an empty plastic container found within the shopping bag.

14.     Also in the shopping bag, law enforcement found three digital scales, a green ziplock bag containing a white powder substance, and two straws inside the shopping bag.  A portion of the white powder field tested positive for cocaine. The powder substance and ziplock bag weighed approximately 7.68 grams.  A white powder substance was observed on at least one of the scales, which is consistent with the scale's use to weigh and measure controlled substances prior to distribution.

15.     During a search of the upstairs bedrooms, detectives identified one room as belonging to the defendant. Male clothing, several pieces of mail matter in the name Keith Cooper, and other identifying documents such as a high school diploma for Keith Cooper were located inside this room. The mattress in this room appeared to be the same blue and pink floral print mattress that was photographed with the pistol on the defendant's phone on April 26, 2016. The mattress was photographed and a section of the mattress was recovered as evidence. The only other bedroom in the house was identified as belonging to the decedent. Law enforcement found no evidence of any other persons occupying this residence.

16.     Detectives conducted a search of the defendant's criminal history. A records check revealed that in Superior Court of the District of Columbia Docket 2012CF2018389, Keith Cooper plead guilty to Unauthorized Use of a Vehicle, a felony that is punishable by more than a year of incarceration. As a convicted felon, the defendant is prohibited from possessing a firearm or ammunition by DC Code § 22–4503 and 18 U.S. Code § 922.

17.     Your affiant understands that no ammunition and firearms are manufactured within the District of Columbia.  Therefore, the ammunition and rifle discussed herein were at some point

prior to May 2016 shipped or transported from one state to another.

18.     As mentioned above, the defendant gave consent to law enforcement to seize all data from his phone.  Among various text messages and SMS messages contained within the defendant's phone were certain conversations that are, based on your affiant's training and experience and consultation by law enforcement with one of MPD's drug experts, consistent with drug trafficking conversations.  These textual conversations included the following:

| May 13, 2016 | From phone number A to defendant's phone | My girl wants to know how much youd do a 3.5 for |
|---|---|---|
| | From defendant's phone to A | 50-60 |
| | From A to defendant's phone | No 3.5 grams of down |
| | From defendant's phone to A | 560 |

This textual conversation is consistent with A inquiring of the defendant about the price for an "eight-ball" of crack cocaine, and the defendant responding with a price (which at $560 would be quite expensive for an "eight-ball", which might often sell for approximately $150).

| May 7, 2016 | From phone number B to defendant's phone | R u good |
|---|---|---|
| | From defendant's phone to B | Yea |
| | From B to defendant's phone | Can u do a straight g for 120? |
| | From defendant's phone to B | All I Got is A Half 2ma |
| | From B to defendant's phone | I got to call u from [telephone number B1] that's my girl phone my phone dieng |
| | From defendant's phone to B | Ok |
| | From B to defendant | We're I'm coming? |

|  | From telephone number B1 to defendant's phone | Im otw |
|---|---|---|
|  | From B1 to defendant's phone | Were im coming |
|  | From defendant's phone to B1 | 47th Street se |
|  | From B1 to defendant's phone | K |

This textual conversation is consistent with B asking if the defendant is good for a drug transaction, inquiring about a gram of an illegal substance, the defendant responding he only has half of the requested amount, and the two arranging for a location on 47th Street for a drug transaction in which the defendant would provide the drug to B.

The next day, B had another textual conversation with the defendant's phone:

| May 8, 2016 | From telephone number B to defendant's phone | U good yet? |
|---|---|---|
|  | From defendant's phone to B | Yea |
|  | From B to defendant's phone | Can u do a g for one twenty that's all I got |
|  | From defendant's phone to B | Half Time Right Now |
|  | From B to defendant's phone | All u got is a Half? |
|  | From B to defendant's phone | If it's a straight-up I'll get it |
|  | From defendant's phone to B | Yea This Is Straight Up |
|  | From defendant's phone to B | On Your Way |
|  | From B to defendant's phone | Leaving in ten |
|  | From defendant's phone to B | Ok |

|  | From B to defendant's phone | I'll pay eighty just make sure it's in cut and a .5 |
|---|---|---|
|  | From B to defendant's phone | Un cut |
|  | From defendant's phone to B | Yea All That |
|  | From B to defendant's phone | I'll be there in 5 minutes |

This textual conversation is consistent with B arranging to meet with the defendant for a drug transaction; inquiring of the defendant if the defendant can do a whole gram of a controlled substance (perhaps heroin, crack, or expensive powder cocaine) for $120; the defendant indicating he only has half that amount; B indicating if it is un-cut (not watered down or "cut" with filler product) he will pay $80 for it; and B indicating that he will meet the defendant in five minutes in order to purchase a half gram substance from the defendant.

| April 18, 2016 | From telephone number C to defendant's phone | Can u crush it and make it look soft |
|---|---|---|
|  | From C to defendant's phone | And otw where should I come to |
|  | From C to defendant's phone | And just crush it down |
|  | From defendant's phone to C | 47th Street |
|  | From C to defendant's phone | It's crushed right be there soon thank u |
|  | From defendant's phone to C | About Too Do It Now |
|  | From defendant's phone to C | 47th Street |
|  | From defendant's phone to C | Wassup |

This portion of a textual conversation is consistent with C inquiring whether the defendant can crush an illegal substance in order to make it look soft, possibly crack cocaine being crushed into powder; and the defendant indicating that the drug transaction in which he will deliver the

controlled substance will take place on 47th Street.

19.     Based on the totality of the circumstances here, your affiant submits that the 7.68 grams of a powder substance that field-tested positive for cocaine is consistent with intent to distribute. These circumstances include: the textual conversations above that are consistent with conversations about drug transactions in which the defendant is the seller (whether of powder cocaine or other controlled substances, as drug dealers can sell different products); the presence of the three digital scales in the same shopping bag as the powder substance (in addition, a powder residue was noticed on at least one of these scales, which is consistent with its use to weigh and measure and then distribute certain amounts of controlled powder substances); and the presence of the rifle and ammunition and the photo of the handgun in the defendant's phone. Your affiant knows that drug dealers often seek to protect the locations of their drugs and drug proceeds with firearms and ammunition, as they are not willing to rely on law enforcement given their illegal trafficking.

_____
DETECTIVE DAMION JOHNSON
METROPOLITAN POLICE DEPARTMENT

SWORN AND SUBSCRIBED BEFORE ME ON THE \_\_\_\_\_ DAY OF MAY, 2016.

_____
U.S. DISTRICT CHIEF JUDGE BERYL A. HOWELL